The INCORPORATION OF MARYLAND
HEIGHTS, Barnett, et al.,
Respondents,

v.

Harry VON ROMER, et al., Appellants.

No. 49193.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 5, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
March 14, 1985.

Application to Transfer Denied
April 30, 1985.

---

Thomas W. Wehrle, Clayton, for appellants.

Howard Paperner, Clayton, for respondents.

CRANDALL, Presiding Judge.

This appeal involves the effort to incorporate the City of Maryland Heights. Barnett, et al., petitioners, filed their petition with Von Romer, et al., being members of the St. Louis County Council, seeking an election to incorporate a portion of unincorporated St. Louis County as a city of the third class to be known as the City of Maryland Heights. After a hearing the Council denied the petition, thereby ruling that an election could not take place. Petitioners appealed to the Circuit Court of St. Louis County. The circuit court reversed the decision of the Council, finding an abuse of the Council's discretion, and ordered that an election be held.[1] We affirm the judgment of the circuit court.

Section 49.230, RSMo (Supp.1984), provides for appeals of decisions of county commissions to circuit courts: "The circuit court shall proceed to hear and determine the case in the manner provided by section 536.140, RSMo. Appeal from the decision on review may be taken by the county commission or other aggrieved party as in civil cases." Section 536.140, RSMo (1978), the statute covering appeals from decisions of administrative agencies, delineates the scope of review of the trial court.

Our review is of the County Council's action and not the judgment of the circuit court. *Evangelical Retirement Homes v. State Tax Commission,* 669 S.W.2d 548, 552 (Mo. banc 1984). "The scope of review of an appellate court with respect to an administrative decision is the same as that of the circuit court." *Ingram v. Civil Service Commission,* 584 S.W.2d 633, 634 (Mo.App.1979).

Section 72.080, RSMo (1978), sets out the requirements for incorporation of a municipality.

> Whenever a number of voters equal to fifteen percent of the votes cast in the last gubernatorial election in the area proposed to be incorporated shall present a petition to the governing body of the county in which such city or town or area is situated, such petition shall describe, by metes and bounds, the area to be incorporated and be accompanied by a plat thereof, shall state the approximate population and the assessed valuation of all real and personal property in the area and shall state facts showing that the proposed city shall have the ability to furnish normal municipal services within a reasonable time after its incorporation is to become effective and praying that the question be submitted to determine if it may be incorporated. If the governing body shall be satisfied that a number of voters equal to fifteen percent of the votes cast in the last gubernatorial election in the area proposed to be incorporated have signed such petition, the governing body shall submit the question to the voters.

The parties agree that the petition that was filed meets the requirements of the statute except for the requirement that Maryland Heights "have the ability to furnish normal municipal services within a reasonable time." In order for the City of Maryland Heights to provide such services, it would be required, not unexpectedly, to tax the

---

1. Although not part of the record below, the parties agree that the election was held during the pendency of this appeal and the incorporation of the City of Maryland Heights was approved by the voters. In this opinion we therefore refer to the City in the present tense.

citizens of its City in order to pay for the municipal services rendered. In the petition and at the hearing one of the methods included in the plan of the residents was the levy of a five percent gross receipts tax on public utilities. If that tax were imposed, Maryland Heights would have the necessary tax base to provide normal municipal services within a reasonable length of time. Without the tax the projected revenue for the City would be inadequate.

The sole, articulated reason for rejection of the petition was that Mo. Const. Art. X, § 22(a), the Hancock Amendment, prevents the incorporation. The argument espoused is that § 72.080 requires the municipality to be able to provide normal municipal services. Maryland Heights cannot meet this requirement without a tax levy. The Hancock Amendment, the County assumes, prohibits a levy of taxes without the approval of a majority of the voters within the City of Maryland Heights. Therefore, the County argues, the petition fails, as a matter of fact, to establish that Maryland Heights can meet the statutory requirements of § 72.080 because the voters therein might vote down the tax levy. The logical extension of the County's argument is that, for all practical purposes, there can never be an incorporation of a new city in the State of Missouri. We disagree.

■ Section 72.080 is a grant of power to the majority of the electors of an unincorporated area of the right to incorporate, rather than a grant of power to the governing body of counties. *State ex rel. Boone v. Jackson County*, 541 S.W.2d 312, 315 (Mo.App.1976).

We next consider what the obligation or role of the governing body is when a petition to hold an election to incorporate is presented to it. Certainly, the statute requires it to satisfy itself that the required number of qualified electors have signed the petition. Since no other agency is designated and the petition is filed with the governing body of the county, it is apparent that this governing body is required to determine the sufficiency of the statements to be contained in the petition. But nothing in the statute authorizes them to substitute their judgment for that of the electors as to whether or not the proposed incorporation is feasible and beneficial....

It appears to us that the function of the governing body is to determine the legality of the proposed incorporation before declaring an election. Whereas it is the function of the voters to determine if the proposed incorporation is feasible and beneficial to their interest....

From the *Duquesne* case [322 S.W.2d 857] we conclude that the respondent could investigate and if it determined that the facts stated in the petition showing that the proposed city should have the ability to furnish normal municipal services within a reasonable time were *false*, or that the facts stated *patently* showed that the city could not furnish normal municipal services within a reasonable time, it would be authorized to deny the petition. In fact, it would be its duty to do so to prevent the illegal creation of a city or to prevent the useless expense of holding an election to create a city that was subject to being ousted by a writ of quo warranto.... (Emphasis added.)

*Id.* Cited with approval in *Cherry v. City of Hayti Heights*, 563 S.W.2d 72 (Mo. banc 1978).

For the purposes of this opinion, we will assume without deciding that the Hancock Amendment requires voter approval of any tax levy in the City of Maryland Heights. The County's characterization of the Council's decision as being a resolution of disputed facts is incorrect. The facts are not disputed. The issue is the legal conclusion to be drawn from those facts. In that regard we find that the Council's decision was based on a misapplication of the law.

■ The County cannot "substitute its judgment for that of the petitioners or the voters as to whether or not a proposed city could furnish normal municipal services within a reasonable time, or what services would be normal or *what time would be reasonable.*" (Emphasis added.) *Boone,*

541 S.W.2d at 316. This answers the County's argument based on the Hancock Amendment. Even prior to the Hancock Amendment, whether a city would in fact follow through and impose the necessary taxes was speculative. The only question is whether the plan *could* work.

■ Section 72.080 does not require a proposed city to have tax money in place in order for an incorporation to be proper. Any new city, and many existing cities, have to lift themselves by their bootstraps in order to function or in order to continue to function. Whether a new city can provide normal municipal services or whether an existing city can continue to provide normal municipal services is frequently conjectural.

■ The test advocated by the County is inapposite to the *Boone* and *Cherry* decisions. The question is whether it is possible under the facts as pleaded for the City to meet the statutory mandate. If the facts as pleaded are false or if it is clear from the facts as pleaded that the City could not provide the necessary services, then it would be the duty of the Council to deny the petition.

■ In the present case the facts as pleaded and adduced at the hearing were not false. The stated facts showed that the City could provide necessary services if the voters approved the tax levy. There is no contention that the proposed tax would be unreasonable either as to amount or type. The Council, therefore, was obligated to permit the election.

The judgment of the circuit court is affirmed.

CRIST, J., concurs.

SNYDER, J., dissents in a separate dissenting opinion.

SNYDER, Judge, dissenting.

I respectfully dissent. The agreed facts show patently that the proposed city could not furnish normal municipal services within a reasonable time.

Respondents' petition to the St. Louis County Council projected a budget with annual expenditures of $3,610,952, including capital expenses of $376,545. Revenues were projected at $4,186,842 annually, including a gross receipts utility tax collection of $1,867,171 or 44.6% of the total revenues. It is obvious that without the utility tax the city could not exist.

It would require months to submit the tax to a vote of the people, and in these days of resistance to increased taxes and more government, there is no assurance that a majority of the voters would approve a substantial addition to their already high utility bills. Even if the utilities tax were to be approved, the revenue would not be available within a reasonable time.

And what happens if the utility tax is submitted to a vote and fails of passage? Admittedly the proposed municipality, having failed to raise almost half of the projected revenue requirement, would be able to furnish only minimal municipal services, a chaotic situation for the city residents.

It is true there is always some speculation and conjecture about the ability of a new municipality to raise money and provide services, but the majority would stretch conjecture beyond reasonable limits.

If the Hancock Amendment, Mo. Const. Art. X, Sec. 22(a), does indeed make it difficult for new municipalities to incorporate, then perhaps the solution is an amendment to the Hancock Amendment. It is a part of Missouri law and the citizens who adopted it must live with it.

I would reverse the judgment of the circuit court.